**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **NEWTON ARNOLD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:14 CV 71** |
| | ) | |
| **CITY OF FORT WAYNE, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**OPINION and ORDER**</u>

Plaintiff Newton Arnold alleges violations of his civil rights arising out of a

traffic stop which culminated in the seizure of more than $11,000 in cash. (DE # 12.) He

brings this case against defendant police officers Mark Brown, John Drummer, and

Sonia Atienzo as well as the City of Fort Wayne. Defendants have moved for summary

judgment on all of plaintiff's claims. (DE # 24.) Plaintiff has filed a response (DE # 26),

and defendants have filed a reply (DE # 29.) For the following reasons, defendants'

motion for summary judgment is granted in part and denied in part. Defendants have

also filed a related motion to strike pursuant to Rule 56. (DE # 30.) That motion is

denied as moot.

## I.      FACTS AND BACKGROUND

In the summary that follows, the court refers only to undisputed facts, or, if there

is a dispute, notes that it exists and relies on the version of the fact, or inference

therefrom, that is most favorable to plaintiff. This summary provides an overview.

Additional undisputed facts will be referred to in the analysis that follows.

On May 9, 2012, officers of the Fort Wayne Police Department were conducting surveillance of a residence at 1328 Scott Street in Fort Wayne, Indiana ("Scott Street"). (DE # 24-2 at 1; DE 24-1 at 1-2.) The surveillance operation was initiated in response to a tip that officer Darrick Engelman ("Engelman") had received from a confidential informant ("CI"). (DE # 24 -1 at 1.) According to the CI, a man named Felton Walker ("Walker") resided at Scott Street and was arranging a large narcotics transaction. (*Id.*) Specifically, the CI related that Walker was hosting two out-of-town cocaine distributors and he was attempting to raise money from his cocaine distribution network to purchase several kilograms of cocaine. (*Id.*)

The CI gave detailed information about the vehicles belonging to Felton and the distributors, noting that Felton drove a black Toyota Camry while the distributors would arrive in a large, silver SUV with Nevada plates. (*Id.* at 2.) He further indicated that once Felton had raised the money he would follow the distributors to a nearby site where he would pick up the cocaine before returning to Scott Street to divvy it up among his network. (*Id.*)

Based on this information, Engelman and other detectives began their surveillance of Scott Street. (*Id.*) During their surveillance the detectives observed traffic in and out of Scott Street that they believed was consistent with narcotics trafficking. (*Id.* at 2-3.) Engelman was also able to identify Felton on the premises. (*Id.* at 3.) Later, Engelman's partner, Detective Strayer reported that a van occupied by three men arrived at Scott Street. (*Id.*) The three men entered the residence and stayed for a few

minutes before leaving. (*Id.*) Engelman heard over the radio that Strayer followed the van and that it was stopped for a traffic infraction and the occupants were identified. (*Id.*) Engelman learned that each of the three individuals "had prior involvements with narcotics possession or trafficking" (*Id.*), but otherwise there was no indication that the three individuals were involved in any illegal activity.

Shortly thereafter, Engelman observed plaintiff Newton Arnold ("Arnold"), arrive at Scott Street in a black Cadillac with Peronica Hambright ("Hambright"). (*Id.* at 4.) Engelman watched as Arnold accessed the rear of the vehicle and apparently placed a large object underneath his jacket before he knocked on the door and entered Scott Street. (*Id.*) About five minutes later, Arnold returned to his car and appeared to be holding something in his groin area, which, in Engelman's training and experience, was suggestive of narcotics activity. (*Id.*) With Hambright now driving, Arnold left Scott Street, where Engelman remained on surveillance. (*Id.*)

Arnold's car was next observed by defendant officer Mark Brown ("Brown"). (DE # 24-2 at 1.) Brown was aware that Scott Street was under narcotics surveillance and was informed by the surveillance detectives that Arnold's car had recently departed the residence. (*Id.* 1-2.) He further states that he "was informed over the radio that the Cadillac was observed traveling 38 miles per hour in a posted 30 mile per hour zone." (*Id.* at 2.) Arnold, for his part, disputes that Hambright was speeding while he was a passenger in the car that day. (DE # 26-1 at 2.) At that point, Brown stopped the

vehicle for speeding. (DE # 24-2 at 2.) When he initially approached the vehicle, Brown observed that Arnold appeared to be visibly nervous. (*Id.*)

During the stop, defendant officer John Drummer ("Drummer"), a canine handler, arrived on scene with his police dog, Bodo ("K9 Bodo"). (DE # 24-3 at 1.) Drummer, with K9 Bodo, commenced a drug sniff of the exterior of Arnold's car. (*Id.*) The parties disagree about what happened next.

Arnold states that he watched as Drummer guided the dog around the car two times and that the dog did not alert at any point. (DE # 26-1 at 2.) After the search he says that Drummer put K9 Bodo back in the squad car. (*Id.*) A short time later, Arnold states that Drummer came back to the vehicle to return the occupants' identification and insurance information. (*Id.*) Drummer then said "slow down and have a nice day. Ya'll are free to go," but then quickly asked Hambright if he could search the vehicle. (*Id.*) Hambright demurred that the car belonged to Arnold, and when Drummer asked Arnold, he responded "No - your dog didn't alert!" (*Id.*) Drummer responded by saying "you don't tell me how my dog alerts" and then continued to ask permission to search the vehicle. (*Id.*) Arnold repeatedly refused these requests until Drummer put his hands on his service weapon and ordered Arnold out of the car. (*Id.*)

The officers' version of the search varies slightly. Drummer states that he guided K9 Bodo around the car one time before he turned to do another pass. (DE # 24-3 at 1-2.) Near the passenger door (where Arnold was seated) Drummer states that K9 Bodo's

head "snapped back," giving "several long sniffs" while his "tail went up" (*Id.*) K9 Bodo then continued on to sniff the rest of the exterior of the car. (*Id.*)

Drummer states that at this point he states that he informed Brown of the "finding." (*Id.*) Here Brown states that he returned to the vehicle and returned the identification to Hambright and told her to watch her speed. (DE # 24-2 at 2.) He then states that he stepped back towards his vehicle before pausing to ask Hambright if there was anything illegal in the car. (*Id.*) He then asked permission to search the car and Hambright replied that the car belonged to Arnold. (*Id.*)

According to Brown, Drummer was standing at the passenger door and asked Arnold for consent which he declined (*Id.* at 2; DE # 24-3 at 2.) At this point Drummer told Arnold that K9 Bodo had alerted and again asked for permission to search the car. (DE # 24-2 at 2; DE # 24-3 at 2.) After Arnold refused multiple requests, Drummer ordered Arnold out of the car. (DE # 24-2 at 2; DE # 24-3 at 2.) As Arnold exited the car, Drummer states that he could see what appeared to be marijuana "shake" (tiny bits of plant residue) on the floor of the car. (DE # 24-3 at 2.)

At this point, Drummer performed a weapons pat down of Arnold and felt a large, hard object in his groin area which made the sound of plastic crinkling. (*Id.*) Arnold was handcuffed and Brown searched in his pants and retrieved roughly $11,000 from his pants. (DE # 24-2 at 3; DE # 26-1 at 3.) Drummer then searched the vehicle but did not find any narcotics. (DE # 24-3 at 2.)

The money was seized and placed into evidence while Arnold and Hambright were released without charging. (DE # 24-3.) Arnold also alleges that he was publicly humiliated during the search by having his pants (but not underwear) pulled down, exposing his backside to traffic on a busy street. (*Id.*) And furthermore, he asserts that one of the officers groped his penis and testicles during the search. (*Id.*) Officer Brown specifically contests Arnold's version of the search and states that it took place near his squad car with the door opened so as to shield him from the view of passing traffic. (DE # 24-2 at 2.)

Arnold filed this suit pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. He brings claims against the defendant officers and the City of Fort Wayne for false arrest and unreasonable search and seizure. In the alternative he brings claims for the same violations based on the bystander liability of the defendant officers as well as claims for punitive damages.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion County,* 327 F.3d 588, 595

(7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995). Importantly, the court is "not required to draw every conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

III.    DISCUSSION

At the outset, the court notes the limited factual record that is before it. Defendants' Local Rule 56.1 Statement of Undisputed Material Facts is based entirely on the brief affidavits of five officers. Other than a few stylistic changes, these affidavits are

generally verbatim reproductions of the police reports from the underlying surveillance operation and related traffic stops. (*See, e.g.,* DE # 24-2 at 1-4, "Affidavit of Officer Mark Brown" and *Id.* at 5, " Law Supplemental Narrative".) An officer's narrative report will typically outline the sequence of events and memorialize important facts pertaining to an investigation. As such they can aid the prosecution in evaluating criminal charges and help refresh an officer's memory before testifying in court. However, these reports are rarely an exhaustive account of each and every legally relevant fact that occurred in the course of an investigation or arrest.

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex,* 477 U.S. at 323. With this burden in mind, it should come as no surprise that the typically concise factual outlines in police reports may feature gaps in the narrative that allow a genuine dispute of fact to take hold. This is especially true considering the court's obligation to draw all reasonable inferences in favor of the non-moving party.

A.    *The Traffic Stop of Arnold's Vehicle*

Arnold alleges that the traffic stop of his vehicle was an unreasonable seizure. The Fourth Amendment guarantees the right of the people to be secure in their persons, houses and effects against unreasonable searches and seizures. U.S. Const. amend. IV. Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this Amendment. *Whren v. United States,* 517 U.S. 806,

810 (1996). As such, any traffic stop must be "reasonable" meaning that it is supported by probable cause to believe that a traffic violation has occurred. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (citing *Whren*, 517 U.S. at 810).

Brown and Atienzo did not personally witness any traffic violations. Rather they effected the traffic stop based on a radio communication. As such, they rely on the doctrine of collective knowledge to support the legality of the stop. This doctrine permits a police officer to stop, search or arrest a suspect at the direction of another police officer or law enforcement agency even though the officer performing the stop, search or arrest does not have firsthand knowledge of the facts that amount to the necessary level of suspicion to permit the given action. *United States v. Willams*, 627 F.3d 247, 252 (7th Cir. 2010). In order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) that the officer providing the information, or the agency for which he works, must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *Id.* at 252-53 (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992). A stop is proper so long as the knowledge of the officer directing the stop, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause. *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998).

Here is but one instance where defendants' reliance on such an economical factual record steers towards trouble. Application of the collective knowledge doctrine

requires the court to evaluate whether the officer who ordered the stop possessed probable cause to make the arrest. *See United States v. Hensley,* 469 U.S. 221, 231 (1985) (the lawfulness of a seizure made in reliance on the statements of fellow officers "turns on whether the officers who *issued* the [statements] possessed probable cause to make the arrest")(emphasis in original); *United States v. Nafzger,* 974 F.2d 906, 911-12 (7th Cir. 1992)(analyzing the sufficiency of information possessed by FBI agent who provided information to county law enforcement agency).

However, in this case the officer who observed the speeding infraction and ordered the traffic stop is never identified or discussed in the record before the court. Engelman watches Arnold's vehicle leave Scott Street, but Engelman remains on site to continue surveillance. Brown, likewise does not observe the traffic infraction but is only "informed over the radio" that Arnold's car "was observed traveling 38 miles per hour in a posted 30 mile per hour zone." It is possible that this call came from yet another unidentified member of the surveillance team, and perhaps it is reasonable to infer that the officer witnessed the infraction herself. But perhaps that it is not the case. It is also possible that this information was relayed through Engelman, who may have received the information from someone else entirely. There are simply too many holes to fill, and as the movant for summary judgment, defendants are not entitled to such generous inferences.

It is not the case that the chain of communication needs to be meticulously documented in order for collective knowledge to apply. *See, Nafzger*, 947 F.2d at 911

("The record does not directly reveal the source of [the arresting officers'] information, but it does reveal that officers at the investigation's command post . . . received specific information from [an FBI agent] who was a key member of the investigative team."). Nevertheless, the source of the information that supplies the justification for a seizure must be sufficiently described such that the court can analyze sufficiency of the information. Based on the limited information at hand, defendants have not established that the informing officer actually possessed sufficient information to justify the stop in the first place, nor have they laid the groundwork for the court to impute the other officer's knowledge of the alleged traffic violation to Brown and Atienzo. In the absence of imputed knowledge of their fellow officers, there is a disputed factual issue as to whether the officers had reasonable suspicion to initiate the traffic stop.

Defendants also argue that the observations of Engelman and the other surveillance officers supplied the officers with reasonable suspicion for an investigatory stop based upon the suspected narcotics activity at Scott Street. (DE # 25 at 4-6.) Arnold contends that the surveillance team's information was insufficient to support the investigatory stop because the surveillance officers did not observe any criminal activity that would give rise to reasonable suspicion. (DE # 27 at 10-11) However, the court can set that question aside because it is first necessary to determine what knowledge can be imputed to the officers on scene.

Beyond the fact that Brown was aware of the surveillance operation at

Scott Street and that Arnold's car was seen leaving that residence, nothing in the record suggests that Engelman communicated with Brown and that Brown in turn relied on that information in effecting the stop. Nor is there any evidence that Engelman and Brown were working in close concert such that Engelman's observations could arguably be imputed to Brown even in the absence of express communication. *cf. Nafzger,* 974 F.2d at 911 ("when officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed"); *but see United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007) ("As there was no communication from Officers Chu and McNeil at the front door to Lopez at the side door, it was improper to impute their knowledge to Lopez.").

It is clear that Brown was at least aware of the surveillance operation at Scott Street and that he was informed that Arnold's car had recently left the residence. (DE # 24-2 at 2-3.) Atienzo's affidavit is silent on the subject. (DE # 24-5.) But beyond the general awareness of the operation, the record is entirely unclear as to the extent of communication and cooperation between the surveillance officers and Brown and Atienzo. Given the lack of clarity in the record, Engelman's observations cannot be imputed to Brown and Atienzo based on the collective knowledge doctrine. *Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir. 2011). Therefore there is a triable issue as to whether Brown and Atienzo possessed reasonable suspicion for an investigatory stop.

Defendants have raised the defense of qualified immunity. The doctrine of qualified immunity shields from liability, police officers who perform discretionary duties and who act in ways they reasonably believe to be lawful. *See Chelios v. Heavener,* 520 F.3d 678, 690-91 (7th Cir. 2008). The defense provides "ample room for mistaken judgments" and protects all but the "plainly incompetent and those who knowingly violate the law." *Wheeler v. Lawson,* 539 F.3d 629, 639 (7th Cir 2008) (citing *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343 (1986))). As such, qualified immunity applies if a reasonable officer could have believed the stop of Arnold's vehicle to be lawful in light of clearly established law and the information that the officers possessed. *Id.* Furthermore, "where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements that probable cause for the arrest existed." *Duran v. Sirgedas,* 240 F. App'x 104, 115 (7th Cir. 2007) (quoting *Rodgers v. Powell*, 120 F.3d 446, 455 (3rd Cir. 1997)).

If presented with even minimal factual development, the court would have little difficulty concluding that it was objectively reasonable for Brown and Atienzo to rely on a fellow officer's account of the traffic violation as the basis for probable cause. Yet, based upon the incomplete record before the court, it is not possible to reach such a conclusion. Therefore the defense of qualified immunity fails at this time. As to the traffic stop of Arnold's vehicle, factual issues remain which must be resolved at trial.

B.    *The Exterior Vehicle Search*

Taking each aspect of the interaction step-by-step, the court now turns to the

canine sniff search of the vehicle. Arnold contends that defendants violated his Fourth

Amendment rights by conducting a canine sniff of the vehicle. His primary argument is

that, because there was insufficient basis for the initial traffic stop, the subsequent

canine sniff was also unlawful and unsupported by probable cause or reasonable

suspicion. (DE # 27 at 11-13.) He also argues that the canine sniff unreasonably

prolonged the duration of the traffic stop to a total of 45 minutes. (*Id.*)

This first argument is closely analogous to the "fruit of the poisonous tree"

doctrine in criminal law.[1] However, that doctrine is not applicable to civil rights

lawsuits brought pursuant to § 1983. *See Snider v. Pekny,* 899 F. Supp. 2d 798, 816 (N.D.

Ind. 2012); *Townes v. City of New York*, 176 F.3d 138, 145-46 (2d Cir. 1999); *Cannon v.

Christopher*, No. 1:06 CV 267, 2007 WL 2609893, at *3-5 (N.D. Ind. Sept. 6, 2007)

(collecting cases). The mere fact that the initial stop may have been unlawful, does not

automatically cast each subsequent act in the stop as a constitutional violation unto

itself. *Buchanan v. Kelly,* 592 F. App'x 503, 506 (7th Cir. 2014) ("even if an officer

mistakenly believes that a crime may have been committed, the officer does not, by

extending the stop, violate clearly setablished law so long as the officer had reasonable

grounds for prolonging the stop to investigate") (*citing Valance v. Wisel,* 110 F.3d 1269,

---

[1] *See United States v. Wolbourn,* 799 F.3d 900, 910 (7th Cir. 2015) ("evidence seized as a result of an illegal stop is fruit of the poisonous tree and should not be admitted into evidence")

1276-77 (7th Cir. 1997); *Courtney v. Oklahoma, ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1225 (10th Cir. 2013)). Arnold ultimately bears the burden of establishing that the canine sniff, by itself, was a violation of the Fourth Amendment.

Within the Seventh Circuit, it is well-established that "the use of a drug-sniffing dog in the course of a traffic stop does not constitute a search, and therefore does not in itself violate the Fourth Amendment." *United States v. Taylor,* 596 F.3d 373, 377 (7th Cir 2010). However, a canine sniff "may impact the determination of whether a search is reasonable if the use of the dog causes a delay." *Id.* There is no clear-cut rule for determining a reasonably allowable delay pursuant to a traffic stop. *See United States v. Garrett,* 139 F. App'x 720, 723 (7th Cir. 2005) (stating that if a dog alerted within five to ten minutes of the initial stop, that would likely be a reasonable amount of time, while fifteen or nineteen might be unreasonable); *but see United States v. Richardson,* 700 F.Supp.2d 1040, 1045, 1047-48 (N.D. Ind. 2010) (holding that a two-minute delay beyond the conclusion of a traffic stop, which itself lasted twelve to thirteen minutes, was not unreasonable).

Arnold has not presented any facts from which the court can conclude that the canine sniff caused a delay which unreasonably prolonged the traffic stop. The only fact he presents is that the entire transaction lasted 45 minutes. The premise of his argument seems to be that the canine sniff precipitated other events that ultimately prolonged the traffic stop. However, he does not indicate how much, if any, of this time period is attributable to a delay in waiting for Drummer to arrive and perform the canine sniff.

After all, it is the delay cause by performing the search which is the violation. As such Arnold has failed to present a triable issue as to this aspect of his claim.

      *C.*     *False Arrest and Unlawful Search of Vehicle*

Defendants argue that they are entitled to summary judgment on Arnold's false arrest claim. They claim that, based on the totality of the circumstances, they were entitled to perform a protective pat-down of Arnold during the course of the traffic stop. (DE # 25 at 12-13.) Defendants argue that they had reasonable suspicion to believe that Arnold may have been armed based on Engelman's surveillance observations, Arnold's apparent nervousness during the stop and K9 Bodo's purported interest in the passenger door area during the canine sniff. They also argue that it was justified based upon Drummer's plain-view observation of what he believed to be marijuana shake on the passenger floor. Though notably, this last observation was not made until after Arnold was ordered out of the vehicle.

Defendants' argument misses the point. Viewing the facts most favorably to Arnold, the pat-down search did not occur until *after* the traffic stop had already been completed. "A traffic stop can be converted into a full-blown arrest if it extends beyond the time reasonably necessary to complete the purpose for which the stop was made." *Huff v. Reichert*, 744 F.3d 999, 1005 (7th Cir. 2014) (*citing Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). At this point, Brown had already returned the occupants' ID cards and insurance information. While doing so, he admonished the driver to "slow down and have a nice day" and told them that they were "free to go." Only at this point does Drummer re-initiate questioning Arnold and ask for permission to search the vehicle.

Thus the relevant question is not whether the officers had a reasonable suspicion to perform a protective pat down search while the traffic stop was pending. *See United States v. Williams,* 76 F. App'x 728, 730 (7th Cir. 2003) ("since the [pat down search] occurred before [the officer] completed the purpose of the traffic stop-which would have occurred when [the officer] gave the driver back his license and insurance card and decided whether or not to issue a ticket-the pat-down was justified as long as the interaction . . . constituted reasonable suspicion").

Rather, by extending the traffic stop beyond the completion of its initial purpose, defendants effectively arrested Arnold, and the question becomes whether they possessed probable cause to do so. The knowledge and circumstances that the officers would rely on to support probable cause are largely the same ones that they offered in support of reasonable suspicion. However, they are insufficient to settle the matter at this stage. To begin with, the factual record is insufficient to impute the surveillance officers' knowledge to the officers on scene through collective knowledge. Therefore the the whole scope of the intelligence gathered by Engelman and other surveillance officers does not come into play. The only fact that is fairly attributable to Brown, that Arnold's vehicle was seen leaving a residence that was under surveillance, does not give rise to probable cause. *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014) ("suspicion of illegal activity at a particular location does not transfer such a suspicion to an individual leaving the property").

Likewise, the parties dispute whether or not K9 Bodo actually alerted to the presence of narcotics during the canine sniff. The source of this dispute is not merely

based upon Arnold's assertion that the dog never alerted. Arnold also points to the disparity in how Drummer describes K9 Bodo's alleged alert in contrast to a separate search that he reported later on the same day. During the canine sniff of Arnold's vehicle, Drummer states that K9 Bodo's head "snapped back" and gave "several long sniffs" while his "tail went up" before proceeding to search the remainder of the car. By comparison, later that day, during the search of Felton Walker's vehicle in the course of the same surveillance operation, Drummer describes K9 Bodo's alert to the presence of narcotics thusly:

> "I gave K9 Bodo the search command and Bodo started sniffing the exterior of the vehicle. When we came to the front passenger side door, the window was open and the subjects were still inside. Several times K9 Bodo kept trying to jump up to or into the window and showed interest in that area that was also downwind. I took K9 Bodo past and continued around the vehicle and then came back around, and again, once at the passenger window, K9 Bodo wanted to get inside the vehicle"

(DE # 24-3 at 3.)

Once allowed inside the vehicle, K9 Bodo, located two bags and attempted to sit at that location. (*Id.* at 4.) Drummer further states that K9 Bodo has "made this similar response with the recovery of [narcotics] odors approximately 600 times, including training." (*Id.*)

The substantial difference in the description of these two alerts supports competing inferences as to whether K9 Bodo alerted to the presence of narcotics in Arnold's vehicle. Furthermore, once allowed inside of Arnold's vehicle, Drummer indicates that K9 Bodo "did not give a trained final response for the presence of narcotic odor by sitting and staring." (DE # 24-3 at 6, "Law Supplemental Narrative".) Drawing

all reasonable inferences in favor of Arnold, these differences along with Arnold's observations are enough to substantiate a genuine dispute as to whether K9 Bodo alerted to the presence of narcotics giving rise to probable cause.

The parties dispute whether there was marijuana shake on the floor of the vehicle. Arnold states that the floor was clean and that there was no marijuana shake on the floor. No sample was ever recovered or tested, and K9 Bodo did not make any alert to that particular area. This alone is enough to create a triable issue. More importantly, Drummer did not see the marijuana shake until after he placed his hand on his service weapon and ordered Arnold out of the vehicle to effect a search. That is, he did not see the alleged marijuana shake until after the seizure in question had already occurred. Probable cause concerns the totality of the facts and circumstance known to the officer *at the time* of the arrest. *Abbott v. Sangamon County,* 705 F.3d 706, 714 (7th Cir. 2013). Any subsequent observations do not factor into whether probable cause existed in the first place. *Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013) ("[P]robable cause is not determined in retrospect. It depends on what the police know, or reasonably believe, at the time."). Because Drummer's observations are disputed and subsequent to the initial seizure, they do not support probable cause.

Lastly, Defendants rely on Arnold's apparent nervousness during the stop to support probable cause. While it may be useful under the totality of the circumstances, nervousness by itself is of little probative value, and is insufficient to support reasonable suspicion, let alone probable cause. *Huff*, 744 F.3d at 1007 n.3 (Noting that the Seventh Circuit and other Circuit Courts have "held that nervous is of limited value

in assessing reasonable suspicion and/or is so common that it alone cannot justify a *Terry* stop.")(citations and quotation marks omitted).

Viewed in the light most favorable to Arnold, the totality of the facts and circumstances do not support the conclusion that the officers had probable cause to order Arnold out of the vehicle. Thus, the ultimate determination of the issue remains for the jury at trial. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993) ("if the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them").

Likewise, having found a material issue of fact as to probable cause, a denial of summary judgment on the issue of qualified immunity results as well. "Where the only issue bearing on immunity is whether the defendant had probable cause to make the search or arrest that is challenged, merits and immunity merge; the dispositive question is simply whether the defendant did have probable cause."  *Boyce v. Fernandez,* 77 F.3d 946, 948 (7th Cir. 1996); *Maxwell,* 998 F.2d at 435-36; *Northen v. City of Chicago,* 126 F.3d 1024, 1027 (7th Cir. 1997).

      D.     *Unlawful Search of Arnold's Person and Seizure of Property*

Having established that factual issues remain as to the false arrest claims, the court now turns to Arnold's claim that the officers unlawfully searched in his pants and wrongfully seized more than $11,000 therefrom. Defendants assert that they are entitled to summary judgment arguing that, upon performing a pat down search of Arnold they possessed probable cause to conduct a more invasive search because they were readily

able to detect that the money in his pants was contraband. (DE # 25 at 14.) In doing so, they rely on an outgrowth of the plain sight doctrine first described by the Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366, 373-74 (1993). The "plain feel" exception provides that if, during the course of a pat down search, an officer feels an object that he immediately identifies as contraband, the officer may seize that object without first obtaining a warrant. *Id.* at 373, 375-76. The operative element of this exception is that the contraband's incriminating nature, whether weapons, narcotics, or something else, must be immediately apparent to the frisking officer.

By way of affidavit, Drummer states: "I did a pat down of Newton Arnold for weapons and when I felt around his waist without manipulation, I could feel a large/hard object that made the sound of plastic crinkling." (DE # 24-3 at 2.) Arnold was then placed in handcuffs before Brown searched inside his pants to recover a large sum of money in plastic bag. Arnold argues that the incriminating nature of the contraband was not readily apparent based on Drummer's brief recounting of the search, and he is correct. This is but one more demonstration of the danger of moving for summary judgment on such a spartan factual record. Perhaps it is the case that, based upon Drummer's training and experience, he could immediately sense that the object in Arnold's pants was contraband. If so he would need to be able to credibly specify his basis for such a conclusion. In any case his brief affidavit makes no such claim. Defendants strongly argue this inference in their briefs, but in doing so, they misapprehend their burden as the movant for summary judgment. Thus, because there

are competing reasonable inferences and disputed facts, this determination will be reserved for the jury.

E.    *Bystander Liability Claims*

Defendants move for summary judgment on Arnold's claims premised on bystander liability. (DE # 25 at 19.) In order to prove the liability of a bystander in § 1983 cases, the plaintiff must show that the bystander "(1) had reason to know that the fellow officer was using excessive force or was committing a constitutional violation, and (2) had a realistic opportunity to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). The entirety of defendants' argument in both the initial and reply brief is that, because no constitutional violation occurred, there is no bystander liability. (DE # 25 at 19; DE # 29 at 12.) Defendants do not otherwise raise any argument as to the merits of the issue. As such, because factual disputes remain as to the existence of the underlying constitutional violations, summary judgment is likewise denied as to the claims premised on bystander liability.

F.    *Punitive Damages Claims*

Defendants have moved for summary judgment on Arnold's claims for punitive damages. "A jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Thus, for Arnold's claims to survive summary judgment, he must show that there is at least a material fact in dispute

regarding whether a reasonable factfinder could decide that defendants at the very least acted with reckless or callous indifference to Arnold's federally protected rights.

In support of his punitive damages claims, Arnold asserts that the succession of searches involved multiple violations of his constitutional rights and he also highlights the invasive nature and public setting of the search. However, the facts he presents do not rise to the level of callous or reckless disregard for his rights. By his own admission, his underwear was not pulled down, and thus his private parts were not publicly exposed. Nor does the invasiveness of the search support punitive damages. Given that the cash was concealed in his pants, it is entirely expected that the officers would focus their search on that area. Moreover, though he alleges that his genitals were "groped" by one of the officers, he does not describe the act on any level that would support the finding that the officer acted with evil intent or reckless disregard for his rights. *compare Washington v. Hively*, 695 F.3d 641 (7th Cir. 2012) (punitive damages claim allowed where correctional officer gratuitously fondled plaintiff's testicles for five to seven seconds and again for two or three seconds). Defendants' motion for summary judgment is granted as to Arnold's claims for punitive damages.

*G. City of Fort Wayne*

Arnold indicates that he no longer wishes to pursue his claims against Defendant City of Fort Wayne. (DE # 27 at 2.) Summary judgment is accordingly granted as to the City of Fort Wayne.

*H.* *Motion to Strike*

Defendants have also moved to strike potions of Arnold's affidavit. (DE # 30.)

Specifically, defendants seek to exclude paragraphs, 4, 5, and 12 of Arnold's affidavit.

As is evident from the discussion above, none of these paragraphs were necessary for

the resolution of defendants' motion. Accordingly the motion is denied as moot.

## IV. CONCLUSION

For the foregoing reasons defendants' motion for summary judgment (DE # 24)

is **GRANTED IN PART AND DENIED IN PART**. Defendant's motion is granted as to

plaintiff's claims for punitive damages and all claims against the City of Fort Wayne

and is denied as to the remaining claims consistent with this order. Defendant's motion

to strike (DE # 30) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1)(A), FED. R. CIV. P. 72(a), and LOCAL RULE

72-1(b), the court hereby **ORDERS** that this case be referred to Magistrate Judge Susan

Collins for purposes of holding a settlement conference within 90 days of the date of

this order.

The court will set a trial date under separate order.

**SO ORDERED.**

Date: September 28, 2016

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT